FILED
2015 Jan-23  PM 03:30
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN  DIVISION

| | | |
|---|---|---|
| NAVOLIN PHILLIPS, | ] | |
| | ] | |
| **Plaintiff,** | ] | |
| | ] | |
| v. | ] | |
| | ] | **CV-13-BE-1208-S** |
| FAMILY DOLLAR STORES, INC., | ] | |
| | ] | |
| **Defendant**. | ] | |
| | ] | |
| | ] | |

### MEMORANDUM OPINION

This matter, asserting discrimination based on race brought pursuant to 42 U.S.C. § 1981, is before the court on "Defendant Family Dollar Stores of Alabama, Inc.'s Motion for Summary Judgment." (Doc. 20). This motion has received thorough briefing: Defendant filed a brief (doc. 21) and evidentiary material (docs. 22 through 22-5, 24 & 37) in support of its motion; the Plaintiff filed a brief in opposition (doc. 27) with evidentiary material (doc. 26, 31); and the Defendant subsequently filed a reply (doc. 35). For the reasons stated in this Memorandum Opinion, the court FINDS that the motion for summary judgment is due to be GRANTED.

### PROCEDURAL BACKGROUND

On June 28, 2013, the Plaintiff filed this lawsuit against her employer, Family Dollar Stores of Alabama, Inc., asserting race discrimination based on her termination. (Doc. 1, as amended in Doc. 13). On May 27, 2014, Family Dollar filed the motion for summary judgment currently under submission (doc. 20) with accompanying evidentiary material (doc. 22),

1

including the Declaration of David Swanger (doc. 22-4).  On June 18, 2014, the Plaintiff filed a

motion to strike (doc. 28) Swanger's declaration, and an amended motion to strike (doc. 29).

After holding a conference to discuss the motion to strike, the court granted the motion to strike

and struck Swanger's declaration.  (Doc. 36).

## FACTS

In March 2002, Family Dollar hired the Plaintif, Navolin Phillips, an African-American

female, as a clerk in the Selma, Alabama store.  In October 2004, the Defendant Family Dollar

promoted her to Store Manager in the Camden, Alabama store, and then she moved back to the

Selma store in 2006 as a Store Manager.   Phillips never applied for any position at Family Dollar

that she did not receive.

*Phillips's Performance Deficiencies before Midfield*

During the time that she worked as Store Manager in Selma, Scott McLeod, a Caucasian

male, and later Felicia Coleman, an African-American female, held the position of District

Managers over Phillips's store; they instituted a number of Performance Improvement Action

Plans to counsel Phillips for performance deficiencies.  More specifically, when McLeod was

District Manager, he issued three counseling reports for deficiencies in Phillips's work: (1) a

verbal counseling report on August 22, 2007 for overspending her payroll budget; (2) a written

counseling report on August 29, 2007 for failing to complete notes he had instructed her to

complete on an earlier visit; and (3) a written counseling report on February 18, 2008 for

overspending her payroll budget with an Associate's Improvement Action Plan requiring her to

communicate via telephone the store's total payroll information every work day.

Felicia Coleman, like McLeod before her, documented problems with Phillips's

performance; she issued four disciplinary reports to document Phillips's deficiencies during her

tenure as manager: (1) & (2)  written warnings on July 21, 2010 and October 6, 2010 for

overspending her payroll budget, with accompanying Associate's Improvement Action Plan to

attempt to remedy the problem; (3) a verbal counseling report on October 6, 2010 for failing to

transmit required paperwork; and (4) a decision-making-step on October 8, 2010 for

overspending her payroll budget with a warning that "Navolin is now on notice not to overspend

her budget again or this may result in reassignment or termination.  She has to take this seriously.

She must regain control."  (Doc. 22-1, at 84; Phillips Dep. Ex. 2 ).  Phillips acknowledges that a

"decision-making step" is the last step before termination, and she does not claim that these

Performance Improvement Action Plans issued during her tenure at the Selma store were based

on race.

> *Phillips's Work History at Midfield*

In December of 2010, Glenn Waite, the African-American Area Operations Manager over

Family Dollar District 53, moved Phillips to Store #4019 in Midfield, Alabama, one of the 24

stores within Waite's management sphere.  Julie Njoku, a female African-American, was the

Performance Manager in District 53 and functioned as an assistant to Waite.  In high volatility

markets, Family Dollar assigns two supervisory personnel to a district: an Area Operations

Manager instead of a District Manager, and also a Performance Manager as his assistant.

Although the testimony varies about whether Phillips's store was in a volatile location, Phillips

had supervision from both an Area Operations Manager and a Performance Manager.   According

to Phillips, the volume of Store #4019 requires two assistants at the store, but Phillips did not

consistently have two assistant managers working at the store; different assistants were "coming

in and out" of the store.  Thus, she claims that the company did not provide her with proper, consistent staffing.  According to Richard Gibson, who was a subsequent Area Operations Manager over the Midfield Store #4019, that store was a low volatility store in comparison to other Family Dollar stores in that district and market.

On April 9, 2011, Waite visited the Midfield store, and completed an "Every Store Visit" form, rating Phillips's store at 2.75/10.00.   Scores of 5.25/10.00 and below equate to an F.  The form listed the following scores: 0.5/1.25 points in the category of "Customer Experience"; .25/.50 points in the category of "Team Member Experience"; 0/3.25 possible points in the category of "Recovery[1]"; 0/1 point in the category "In Stock Position; 0/1 point in the category "Door to Shelf"; 0.5/1 point in the category "Office/Shrink[2] Control"; 1/1 point in the category of "Schematics"; and .5/1 point in the category of "Monthly Planner."  (Doc. 22-1, at 89; Phillips Dep. Ex. 7).   Thus, Waite was the third  supervisor to document problems with Phillips's performance.  Phillips does not claim that this April of 2011 discipline was based on her race.

In the Spring of 2011, the company transferred Waite to another district, and Rich Gibson, a Caucasian, replaced Waite.  (Doc. 26-1, at 5).  While Gibson was in training for his new Area Operations duties in District 53, Sharlean Geter, an African-American female, helped to perform Area Operations Manager duties.  On May 17, 2011, Geter issued a written counseling report to Phillips for poor store standards with a Performance Improvement Plan documenting Geter's advising Phillips that May 24, 2011 was her deadline to clean up the back

---

[1]Recovery means that the merchandise is pushed to the front of the shelf, that the store is kept full, and that the merchandise is on the floor and not in the stockroom, so that the customer can see it.

[2] Shrink means inventory loss at a store.

room, and that the failure to do so would lead to her termination.  Three days later on May 20,

2011, Geter completed an "Every Store Visit" form regarding Phillips's store, and gave Phillips a

rating of 4.75 for the visit, which equated to an F.  She scored a 0.5/1 in the Office/Shrink

Control category.  (Doc. 22-1, at 98; Phillips Dep. Ex. 8).  Thus, Geter was the fourth supervisor

to document significant problems with Phillip's work.  Phillips does not assert that the written

counseling that Geter gave her was based on Phillips's race.

Also in May of 2011, after Waites left as District Manager, Phillips asked Family Dollar

via Geter to allow her to step down from the Store Manager position to an Assistant Manager

position, because Geter had threatened to cut her pay and because Phillips believed that she did

not have sufficient help to keep up the store without an assistant.   Geter noted this request on her

May 17, 2011 Performance Improvement Action Plan.   (Doc. 22-1, at 85; Phillips Dep. Ex. 3).

The briefs' Statements of Fact do not reflect the company's response to this request, except that

Phillips remained in the position of Store Manager until her termination.

On June 9, 2011, Phillips received another Performance Improvement Action Plan, this

time from Performance Manager Njoku.  The decision-making step stated that Phillips was not

following company direction on logbooks, cash handling, back door, door to shelf, and DVR

review.  Phillips agrees that her store experienced problems in the areas that Njoku listed on June

9, 2011, and Phillips does not claim that this decision-making step was based on her race.  Njoku

was the fifth supervisor to document significant problems with Phillips's work.

On the day after the issuance of the decision-making step, June 10, 2011, Njoku

completed an "Every Store Visit" form and performed a shrink estimate.  Njoku gave Phillips's

store a rating of 4.0 on this visit, which equated to an F.  She received a score of 0 in the category

of Office/Shrink Control.   (Doc. 22-2, at 12; Phillips Dep. Ex. 16).

On June 20, 2011, Njoku issued yet another Performance Improvement Action Plan to Phillips, giving her a written warning because she was over payroll budget.   Phillips does not claim that the June 20, 2011 discipline action was based on her race.

On August 25, 2011, Gibson issued a Performance Improvement Action Plan to Phillips, reflecting a "decision-making step" (the step before termination) for being over payroll budget. Phillips does not claim that this disciplinary action was based on her race.

*Termination of Phillips*

As of the end of August of 2011, Gibson made the decision to terminate Phillips, and Family Dollar terminated her on September 13, 2011. A document marked "Monthly Shrink Recap," prepared on or about August 26, 2011, reflected that the company discovered on July 15, 2011 that a serious inventory shrink problem existed with Phillips's store.  The "Monthly Shrink Recap" document reflected a $▮▮▮▮▮ difference between Phillips's store inventories on May 20, 2011 and on August 26, 2011, a three-month time period. The document further stated in relevant part as follows:



(Gibson Dep. Ex. 1, Doc. 24-1, Sealed).

Gibson testified that field specialists referenced in this document were Family Dollar associates who were available to assist underperforming stores and supporting a store manager that was struggling in a given area.  He testified that Phillips's store was a low volatility store when compared to other stores within that market, and yet, he had to send associates to help Phillips clean up her store, and he had warned her that she needed to improve her operation execution.  Gibson further testified that this document reflected that "Phillips was terminated for poor performance, including deficient numbers in her store."  (Gibson Dep. Doc. 22-3, at 21, p. 82).  The August "Monthly Shrink Recap" document also stated, on August 29, 2011:   "██████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████████."[3] (Gibson Dep. Ex. 1, Doc. 24-1, at 1 Sealed).

On September 3, 2011, prior to Phillips's termination but after Gibson had made the decision to terminate her, Gibson conducted a store evaluation for Phillips's store.  Gibson filled out an "Every Store Visit" form that resulted in a score of 3.75/10.00, which equated to an F. Phillips received no points in the categories of "Recovery," "In Stock Position," or "Schematics," and received scores of 1/1.25 in "Customer Experience"' .25/.50 in "Team Member Experience" and .75/1.0 for both "Office/Shrink Control" and "Monthly Planner."  Phillips received 1/1 point on "Door to Shelf."  (Gibson Dep. Pl.'s Ex. 2, Doc. 22-3, at 38).  This score was the fourth "F" score Phillips had received from four different supervisors: Waite, Geter, Njoku, and Gibson.

---

[3]  The document was unclear whether Gibson originally intended August 29, 2011 to be Phillips's termination date, and then he postponed the termination to September 13, 2011, or whether August 29, 2011 was the date he met with Lazenby to plan Phillips's termination.

Three of these four supervisors are African-American.

On September 13, 2011, Rich Gibson met with Phillips at her store and advised her that she was being terminated.   Gibson had arranged for a police officer to be present at the store that day when he gave Phillips the news because Gibson was concerned about her reaction. According to Phillips, Gibson explained that her "shrink" numbers from loss of inventory were the reason for her termination; he said that he did not allow that type of shrinkage.  The Personnel Action Form for Navolin Phillips's termination contained a code for the termination reflecting that she was terminated for failure to protect company assets.  Donna Barden, Supervisor, HR Administration for Family Dollar Stores, Inc., testified that the use of this code means that her job "performance resulted in inventory loss, not that she was terminated for unauthorized removal of company property and/or funds."  Barden's declaration refers to Phillips's Personnel Action Form but does not attach it.   (Doc. 22-5, at 2).

In the conversation advising her of her termination, Gibson did not mention poor store conditions or other performance issues as factoring into the termination.  Njoku was also present during the termination meeting, and when Gibson gave the reason for the termination, Phillips recalled Njoku looking upset and getting up to leave. Phillips then gave Njoku the keys to the safe and asked Njoku to count the money before Phillips left.  Phillips next attempted to follow Njoku, but Phillips claimed that Gibson grabbed her by the shirt collar from behind and pulled her back into the swinging stockroom doors.  According to Phillips, she broke free and moved to the front of the store, where she told Njoku that Gibson had put his hands on her and that she was mad about it.  Phillips did not report Gibson's actions to the police; she claims that the police officer left the store before Gibson grabbed her.

8

*Phillips's Post-Termination Actions*

Following her termination, Phillips left the store and went directly to her attorney's office, and also called Family Dollar's hotline to complain.  The hotline call report reflects that Phillips complained that Gibson had unfairly terminated her because of her race and/or because her salary was too high, as she had worked at the company for nine years.  Phillips complained that Gibson had terminated other unnamed employees who had worked for the company for seven years or more.  The report does not mention any complaint about Gibson grabbing Phillips.  However, it does mention that Gibson had previously failed to help Phillips obtain a substitute to work for her although he assisted a white Store Manager in finding substitutes. Phillips acknowledged in the hotline call that she did not complain about racial discrimination to management before her termination, but she claims she did complain during her hotline call about Gibson grabbing her by the shirt collar even though the report did not document the complaint.

*Family Dollar's Post-Termination Actions*

The company took an inventory of the store Phillips managed on September 13, 2011, the date of her termination.  ████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████ (Doc. 22-3, at 15-16, pp. 60-63, Gibson Dep.;

Doc. 24-1, at 3, Pl.'s Ex. 7 to Gibson Dep., Sealed).   In preparation for this inventory, Njoku

sent an employee to assist in getting store conditions under control, and that person had assisted

the day before the inventory for approximately eight hours.   After this assistance with store

conditions, Phillips's store received a "C" score on September 13, 2011, the first score during the

general period of her management[4] of the store that was not an "F."

  Phillips attributed part of the poor inventory numbers to prior management and the lack

of assistant managers in the store.   Phillips took over the store in December of 2010, only three

months after the September 27, 2010 inventory, so, at the time of the September 13, 2011

inventory, she had been Store Manager for nine months.   ████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

  Family Dollar replaced Phillips with Justin Simpson, who is an African-American male,

as Store Manager of Store #4019.

  *Lawsuit*

  On June 28, 2013, Phillips filed suit against Family Dollar, alleging race discrimination.

The only adverse employment action based on race discrimination that she identifies in the

Complaint and in her brief is her termination.   Although Phillips acknowledged that neither

Gibson nor anyone else at Family Dollar had ever made any racially derogatory comments to her,

she nevertheless asserts that Gibson "was kind of racist" for the following reasons: (1) because

---

   [4] Although the inventory occurred *after* Phillips's termination, it occurred on the same day as her termination.

he promoted two other Store Managers to training positions but did not promote her, although she received every promotion for which she applied; (2) because Gibson declined to help her find a substitute for her store so that she could attend a district-wide Store Manager meeting, but on another occasion, Gibson helped a white Store Manager find a substitute by sending an email to Store Managers soliciting a substitute; and (3) because Family Dollar did not terminate Mike Richards, a white Store Manager in her district with what she characterizes as poor inventory results.

*Comparator Mike Richards*

*(1) Resigned or Terminated?*

Phillips testified that Richards, a white Store Manager in her district, had similar inventory loss but was not terminated.  In her deposition testimony, Phillips acknowledged that she did not have any personal knowledge about whether Richards still worked for Family Dollar or, if he did not, about the circumstances of his separation.  In her Statement of Additional Facts, Phillips pointed to a "Separation" form for Michael Richards that was an exhibit to Gibson's deposition, and that listed a separation effective date of November 23, 2011, a couple of months after Phillips's own termination.  The form also provided the following information:

> Eligible for Rehire:      N
> Separation Code:      14
> Method of Separation:  Y
> Two Weeks Notice?    Y
> Employee Evaluation:   5

(Doc. 22-3, at 72, Gibson Dep. Ex. 8).

Gibson, who only worked for Family Dollar for fifteen months and was working elsewhere at the time of his deposition, did not authenticate the form,  interpret it, or verify that

11

the information on the form had been keyed correctly; he testified that he did not recall having

anything to do with Richards's separation, and he could not testify whether Richards left

voluntarily or whether he was terminated.

*(2) No History of Discipline*

The personnel file of Richards is not part of the record on summary judgment.  The

Declaration of Traci Wiggins, a paralegal for Phillips's counsel, stated that she had reviewed

Richards's personnel file that Family Dollar produced, and found no documents in the file

counseling him or otherwise disciplining him for poor performance, nor did any document in the

file show that Family Dollar terminated his employment.  In the reply brief, Family Dollar

admitted that "Phillips has no document or testimony indicating that Family Dollar terminated

Richards' employment."  (Doc. 35, at 5, ¶ 49).

Manager Glen Waite, who was not the same District Manager terminating Phillips,

performed a Performance Review of Richards dated October 25, 2010.   The scores Richards

received under Business were: ███████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

(Doc. 31, at 15-18, Sealed).

In her deposition testimony, Phillips acknowledged that she did not have personal knowledge of Richards's discipline history at Family Dollar; she did not know whether Richards had ever received an "F" score on an Every Store Visit form, whether Richards had received any disciplinary action for being over budget, whether Richards had received any disciplinary action for poor store conditions, or, as referenced earlier, whether Family Dollar terminated his employment.   Phillips presented no documents reflecting that Richards had received disciplinary action, written or oral, and no document or testimony indicating that Family Dollar terminated Richards's employment.

*(3) Inventory Numbers*

Because Phillips argues that Richards had a similar problem with inventory shrink at the Family Dollar store he managed, Store #2618,  yet was not terminated, those inventory numbers are potentially relevant.  Family Dollar admitted or provided the following inventory information about that store, and although Richards did not take the position of Store Manager until 2010, the parties provided 2008 and 2009 store information to document the store status prior to his arrival as a comparison to the store status under his leadership.

As of February 2008, when another employee managed the store before Richards's arrival, the inventory numbers reflected  (Doc. 31, at 20, Sealed). As of March of 2009, when another employee managed the store before Richards's arrival, the inventory numbers reflected (Doc. 37-1, at 1-2, Sealed).

As of October 2010, when Richards was the Store Manager and Waite was the Area Operations Manager, the inventory numbers in Richards's store reflected improvement from 2009: the inventory was ███████████████████████████████████ ███████████████████████ (Doc. 31, at 10, Sealed).  As of October 2011, when Richards continued as the Store Manager and Gibson was his supervisor, the inventory numbers in Richards's store reflected that the inventory was ███████████████████████████████. ██████████████████████████████ (Doc. 31, at 8, Sealed).

The court notes that although Swanger's declaration addressed Richards's separation from the company, the court granted Phillips's motion to strike that declaration.  *See* doc. 36.

*(4) Gibson's Testimony about Comparing Shrink Rates at Different Stores*

Gibson testified that comparing shrink rates from one store to another would *not* be comparing apples to apples, because some stores are located in more volatile neighborhoods with high a customer count as compared to others; without knowing the shrink history at a particular locations and other specific information, he could not make a judgment from looking only at numbers whether the Store Manager was working successfully.  He explained that "[y]ou have to be able to look at each store individually." (Gibson Dep. Doc. 22-3, at 20 p. 77).   According to Gibson, Richards's store in Ensley was one of the most volatile stores and one of the hardest retail operations to run in the entire state of Alabama.  In Gibson's opinion, during his own tenure supervising Richards, Richards was driving operational improvement in his store despite those challenges, and he had "greater mastery over his freight ... getting his freight out in a timely manner, significantly better rate of time than he had prior; and the recovery of the store, just the general cleanliness was significantly more aesthetically pleasing to customers."  (Gibson Dep.

14

Doc. 22-3, at 19, p. 73-74).

## LEGAL STANDARD

Summary judgment is an integral part of the Federal Rules of Civil Procedure.  Summary judgment allows a trial court to decide cases when no genuine issues of material fact are present and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56.  When a district court reviews a motion for summary judgment it must determine two things: (1) whether any genuine issues of material fact exist; and if not, (2) whether the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56).  The moving party can meet this burden by offering evidence showing no dispute of material fact or by showing that the non-moving party's evidence fails to prove an essential element of its case on which it bears the ultimate burden of proof.  *Celotex*, 477 U.S. at 322-23.  Rule 56, however, does not require "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim."  *Id.*

Once the moving party meets its burden of showing the district court that no genuine issues of material fact exist, the burden then shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Disagreement between the parties is not significant unless the disagreement presents a "genuine issue of material fact."  *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)   Substantive law determines which facts are material and which are irrelevant. *Id.* at 248.   In responding to a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).   The non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)); *see also* Advisory Committee Note to 1963 Amendment of Fed. R. Civ. P. 56(e), 28 U.S.C. app. ("The very mission of summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.").   "The non-moving party need not present evidence in a form admissible at trial; however, he may not merely rest on his pleadings." *Graham v. State Farm Mut. Ins.* Co., 193 F.3d 1274, 1282 (11th Cir. 1999) (citing *Celotex,* 477 U.S. at 324).   If he does, or if the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

In reviewing the evidence submitted, the court must "view the evidence presented through the prism of the substantive evidentiary burden," to determine whether the nonmoving party presented sufficient evidence on which a jury could reasonably find for the nonmoving party. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Commc'n, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988).   The court must refrain from weighing the evidence and making credibility determinations, because these decisions fall to the province of the jury. *See Anderson*, 477 U.S. at 255; *Stewart v. Booker T. Washington Ins. Co.*, 232 F.3d 844, 848 (11th Cir. 2000); *Graham v.*

16

*State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999).  Furthermore, all evidence and inferences drawn from the underlying facts must be viewed in the light most favorable to the non-moving party.  *Graham*, 193 F.3d at 1282.  The non-moving party "need not be given the benefit of every inference but only of every reasonable inference."  *Id.*  The evidence of the non-moving party "is to be believed and all justifiable inferences are to be drawn in [its] favor." *Anderson*, 477 U.S. at 255.  After both parties have addressed the motion for summary judgment, the court must grant the motion *if* no genuine issues of material fact exist *and if* the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.

Even if a district court "'believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices.'" *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) (*quoting Miller v. Harget*, 458 F.3d 1251, 1256 (11th Cir. 2006)).  The court should not disregard self-serving statements made in sworn testimony simply because they are self-serving at the summary judgment stage, and if the self-serving statements create a genuine issue of material fact, the court should deny summary judgment on that basis. *Id.* at 1253.

## DISCUSSION

Phillips brings one claim pursuant to Section 1981: that Family Dollar terminated her because of her race.  Because she provides no direct evidence of race discrimination, she relies upon the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973) to present a case based on circumstantial evidence.  Although *McDonnell Douglas* is a Title VII case, the Eleventh Circuit has explained that the standards of proof and analytical elements are the same under both Title VII and Section 1981, so the court analyzes Section 1981

17

claims, such as the current one, under the same framework.  *See, e.g., Jimenez v. Wellstar Health Sys.*, 596 F.3d 1304, 1312 (11th Cir. 2010) (citing *Standard v. ABEL Servs., Inc.,* 161 F.3d 1318, 1330 (11th Cir. 1998)).

Under that framework, to establish a *prima facie* case for disparate treatment based on race in a disciplinary matter, a plaintiff must show that "(1) she is a member of a protected class; (2) she was subjected to an adverse employment action; (3) her employer treated similarly situated employees outside of her protected class more favorably than she was treated[5]; and (4) she was qualified to do the job." *Burke-Fowler v. Orange Cnty., Fla.,* 447 F.3d 1319, 1323 (11th Cir. 2006).

The undisputed evidence establishes that Phillips is an African American who was terminated from her position as Store Manager, and Family Dollar does not assert that she was unqualified for her position.  Rather, Family Dollar challenges element three of the *prima facie* case, arguing that the evidence does not reflect that Family Dollar treated her differently than any similarly situated comparator, and that the comparator Phillips has identified, Michael Richards, is not similarly situated.   Accordingly, the court will focus on element three, the "different treatment of a similarly situated comparator" issue.

"In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir. 1997).  To satisfy the similar offenses prong, the Eleventh Circuit

---

[5] A plaintiff may also establish element three by showing that her employer replaced her with someone outside her protected class, but, in the instant case, the undisputed facts show that Family Dollar replaced Phillips with another African American.

"require[s] that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Maniccia v. Brown,* 171 F.3d 1364, 1368 (11th Cir. 1999); *see Brooks v. CSX Transp., Inc.,* 555 F. App'x 878, 883 (11th Cir. 2014) *(*quoting with approval *Maniccia's* "nearly identical" language)*.* Even if a plaintiff and the comparator are similar in some respects, distinctions in overall job performance may mean they are not "similarly situated" for the purposes of meeting the burden of proof on a *prima facie* case. *See Knight v. Baptist Hospital of Miami, Inc.,* 330 F.3d 1313, 1317 (11th Cir. 2003) (finding that the comparator was not similarly situated to the plaintiff because, even though their histories with co-workers were similar and the plaintiff's placement on decision-making leave arose out of conflict with a co-worker, the overall performance records of the plaintiff and comparator were dissimilar and the leave decision occurred after a review of the plaintiff's entire record ).

One of Family Dollar's primary arguments is that Phillips has failed to show that Phillips and Richards were disciplined in different ways, in that she has not provided *evidence* about the reason for Richards's separation from the company.  The company asserts that Phillips has the burden to establish that Family Dollar terminated Phillips but not Richards, and that she has not done so; she has provided Richards's separation form *that Family Dollar produced to her in discovery* but no testimony authenticating it, interpreting it, or explaining the reasons behind his leaving. The separation form, an exhibit to Gibson's deposition, provides a separation code, with no explanation for the code, and it also contains a "Y" next to the words "Two Weeks Notice," but Family Dollar asserts that this information does not necessarily mean that Richards left voluntarily, and no testimony explains the information provided or verifies that it was keyed in

19

correctly.  Accordingly, the company insists that Phillips has not met her burden.

Phillips argues that she has indeed met her burden of raising a genuine issue of material fact that Family Dollar did not terminate Richards.  The court agrees.  Richards's separation form contains a "Y" after the words "Two Weeks Notice," and the court finds that a common sense interpretation of that information is that Richards gave a two weeks notice, indicating that the separation was voluntary on his part.  That information on the separation form, together with the acknowledged absence of any document in the personnel file indicating that Family Dollar disciplined him or terminated him, support a reasonable inference that he was not terminated, or, at the very least, raise a genuine issue of fact about the issue.

The court notes that Family Dollar obviously could provide evidence explaining and verifying the information and codes on its own separation form, a document the company produced to Phillips during discovery.  The company has chosen not to do so, arguing that Phillips has the burden to prove her case.  While she does indeed have that burden, to the extent, if any, that this choice represents a "hide the ball" strategy, that strategy has no place in the summary judgment process.  Richards was terminated or left voluntarily, and determining which occurred according to the company's separation form should be no deep secret; Family Dollar should have that information and should have provided it to Phillips.  That said, the court, having rejected Family Dollar's argument that Phillips has not raised a genuine issue of material fact on the termination issue, finds that she has met her burden on that point.  Accordingly, the court next proceeds to address the key disputed issue:  whether the two were similarly situated.

Phillips argues that Richards is similarly situated because he was a Store Manager in the same district as Phillips, had the same supervisor in 2011, and had similarly poor inventory

20

percentages: in 2010 (under supervisor Waites, before Family Dollar moved Phillips into her current district), the inventory shortage for Richards was ███%, and slippage was ███%; in September 2011 (under supervisor Gibson since April), the inventory shortage for Phillips was ███% and for Richards was ███%; and the slippage for Phillips was ███% and ███% for Richards.  According to Phillips, despite these similar inventory numbers, Family Dollar treated the two Store Managers differently, terminating Phillips but not Richards, and citing inventory as the reason.

Family Dollar first argues that the Fall 2011 inventory numbers that Phillips is comparing to Richards's were not part of the decision to terminate her, and should not be part of the "similarly situated" calculation.  The September 13, 2011 inventory of Phillips's store occurred *after* her termination, so her termination was not based on these inventory numbers.   Rather, according to a document Marked "Monthly Shrink Recap," Gibson made the decision to terminate her no later than August of 2011 after discovering a $███ difference between Phillips's store inventories on May 20, 2011 and on August 26, 2011, a three-month time period during which Phillips was the Store Manager.  Although the subsequent September 13, 2011 inventory, performed after the termination conversation, confirmed a significant shrinkage problem in the store, Gibson did not have these numbers when he made his decision or when he communicated the decision to Phillips.  Therefore, Family Dollar argues that May through August 2011 inventory numbers are the appropriate ones on which to focus and use as a comparison.  This court agrees.

The record does not reflect a corresponding monthly inventory for the Ensley store under Richards's management, and certainly shows no such inventory with a significant difference of

21

over $███ between inventories in a short, three-month period.  The inventory numbers for Richards's store showed numbers for inventories performed once a year, and the *annual* difference in inventory loss for the Ensley store between October 2010 and October 2011 was $███.  In other words, the inventory shortage over a twelve-month period for Richards's store ($███) was *less* than the inventory shortage over a three-month period for Phillips's store ($███).  Obviously, the inventory shortage is comparable but the time period in which the loss occurred is not, and if the inventory loss at Phillips's Midfield store continued throughout a twelve-month period at the rate of $███ per quarter, the annual loss at Midfield would be over $███, twice the annual inventory loss at the Ensley store.   The court FINDS that these inventory numbers are not sufficiently similar to establish Phillips's *prima facie* case.

Second, the inventory numbers for Phillips and Gibson are from two different stores, and Family Dollar argues that these stores are not comparable.  According to Gibson, comparing inventory shrink rates for different stores is like comparing apples to oranges, because some stores are located in more volatile neighborhoods with high customer counts; he testified that "[y]ou have to be able to look at each store individually."  (Doc. 22-3; Gibson Dep. at 20 p. 77).  Gibson said he would need to have specific information, such as the shrink history at a particular location, to know whether two stores were comparable and whether the manager was performing successfully.  In this case, Gibson testified that Richards's store in Ensley was not comparable to the one Phillips managed in Midfield, because Phillips's store had low volatility in comparison with the Family Dollar stores in that market whereas Richards's store was one of the most volatile stores and one of the hardest retail operations to run in the entire state of Alabama.  Phillips provided no contrary evidence, except that the two stores were in the same district and

22

that her store had enough volatility to warrant an Area Operations Manager and Performance Manager, instead of only a District Manager.

Further. the evidence reflects the following inventory history for Richards's store: 2008 (2 years before Richards took over as Store Manager) inventory shortage of $██████ (████%) and slippage of $██████ (████%); 2009 (the year before Richards took over) inventory shortage of $██████ (████%) and slippage of $██████ (████%); in 2010 (the year Richards took over) the inventory was short $██████ (████%), and slippage was $██████ (████%); in 2011 the inventory was short $██████ (████% ), and the slippage was ($██████) or (-7.69%).  These roller-coaster numbers support Gibson's characterization of the Ensley store as volatile and also reflect that Richards's 2011 inventory shortage and slippage numbers, which appear high at first blush, are significantly *lower* than the inventory numbers in 2009, the year *before* he became Store Manager.  Therefore, given the evidence that Richards's Ensley store was not comparable to Phillips's Midfield store and the evidence providing the Ensley store's inventory history, the court FINDS that Phillips has not established that comparing inventory numbers from the two stores would be comparing apples with apples.  Having so ruled, the court need not consider the arguments addressing issues other than inventory numbers in the "similarly situated" analysis, but it will address them briefly in a desire to be thorough.

Family Dollar also argues that Phillips and Richards were not similarly situated employees because the evidence reflected that Gibson saw improvement in the performance of Richards but not in Phillips.  Gibson testified that, in his opinion, Richards was driving operational improvement in his store and that Richards "was improving with respect to getting freight out in his store and keeping the store clean and aesthetically pleasing to customers."

(Gibson Dep. Doc. 22-3, at 17-19, pp. 66, 73).  Phillips does not contradict that testimony except to point to Richards's inventory numbers.  However, those inventory numbers provide data once a year on specific dates, October 2010 and October 2011, and Gibson only became Richards's supervisor  in April of 2011, halfway between those dates.  The inventory numbers provided do not reflect monthly inventory numbers during the short seven months that Gibson supervised Richards, beginning in April 2011; annual numbers do not necessarily facilitate a comparison of Richards's performance during the particular months of Gibson's tenure as supervisor, and thus, do not confirm or contradict Gibson's testimony that he personally saw improvement during those months.

In contrast, no evidence reflects any improvement on the part of Phillips.  On each "Every Store Visit" form prepared during her tenure as Store Manager at Midfield up to her termination, Phillips received an "F" score.  In the forms prepared in May and June of 2011, during Gibson's tenure, she received "F" scores,  and on the June 2011 form, the last one performed *before* Gibson's August decision to fire her, she received a score of "0" on inventory shrinkage.  Although the form prepared on the date Phillips was fired reflected a "C" score, this score occurred after another employee spent eight hours cleaning and organizing the store.  In the "Monthly Shrink Recap" document prepared in late August of 2011, Gibson noted Phillips's "total disconnect" on two surprise visits to her store on August 11 and August 26, 2011.   In sum, the evidence also reflects that Gibson did not see the performances of Phillips and Richards as similar because he saw Richards as improving and Phillips as repeatedly failing and disconnected.

Finally, Family Dollar argues that it terminated Phillips not only because of her inventory

24

problems but also because of her other well-documented performance problems; because Richards did not have similar performance problems in areas outside of the inventory shrink issue, he is not a similarly situated comparator.  The court agrees that the record reflects no general performance problems with Richards except his shrink numbers.  His personnel file contained no disciplinary actions, and the only evaluation in the record, which occurred before Gibson's tenure, gave him a "needs improvement" and focused on the shrink issue.  In contrast, Phillips's failing evaluations and repeated, frequent discipline for problems such as payroll overages and failure to clean up the storage room are referenced above.

Phillips cannot and does not argue that the two employees have a similar history of employment discipline at Family Dollar.  Instead, she asserts that Phillips's other performance problems are irrelevant because Gibson told her that the termination was because of the shrink problem and did not mention any other performance problems supporting the termination. Further, the Family Dollar form documenting Phillips's termination provides a termination code stating that she was terminated for failure to protect company assets, meaning that her performance resulted in inventory loss, and does not list other performance issues.

The court recognizes that forms with codes do not always allow the person keying in reasons to put multiple reasons where multiple reasons exist, so common sense suggests that the fact that the Personnel Form only gave one reason does not render others irrelevant.  Similarly, the fact that a supervisor focuses on one major performance problem in the difficult termination conversation does not mean that he did not consider other performance problems in making the decision.  Listing every single performance problem could make the termination conversation long and humiliating  when, as here, the list is extensive and when, as here, the employee has

received notice of those problems through evaluations, performance action plans, and other

feedback.  Certainly, if the employer ignores performance issues in documentation at the time of

termination and subsequently focuses on them  for the first time in litigation, that timing would

raise a genuine issue of material fact about their truth, but such is not the case here.  The

"Monthly Shrink Recap" report that Gibson prepared in August of 2011, which reports his

decision to terminate Phillips, not only identifies an unacceptable inventory shrink problem as

the key performance issue but *also* documents other performance problems with Phillips: ███

████████████████████████████████████████████████████████

██████████████████████████████ (Doc. 24-1, at 1, Sealed).  Given

the repeated, pervasive nature of Phillips's other performance problems, and the repeated

notifications to Phillips that termination might result from them, the court cannot find these

problems irrelevant to a "similarly situated" analysis.  Phillips's profound performance problems

in areas other than inventory loss,  problems that comparator Richards did not share,  provide yet

another reason that the two employees are not similarly situated.

> For all of these reasons, the court FINDS that Phillips has failed to raise a genuine issue

of material fact that alleged comparator Richards was similarly situated to her and yet was treated

differently.  Therefore, she has failed to meet her *prima facie* case within the *McDonnell Douglas*

framework to establish that her termination was discriminatory pursuant to Section 1981.  In light

of that ruling, the court need not and does not address Phillips's arguments regarding pretext.

> The court acknowledges the Eleventh Circuit's instruction that "establishing the elements

of the  *McDonnell Douglas* frameword is not, and never was intended to be, the *sine qua non* for

a plaintiff to survive a summary judgment motion in an employment discrimination case." *Smith*

*v. Lockheed-Martin Corp.,* 644 F.3d 1321, 1328 (11th Cir. 2011)  However, Phillips makes no arguments under *Lockheed-Martin,* and if she intends to establish her case by presenting a convincing mosaic of discrimination,  she has the burden to connect the mosaic tiles; the court need not piece together a mosaic when she has not done so.

Accordingly, the court FINDS that Family Dollar's motion for summary judgment is due to be GRANTED.  The court will enter a simultaneous Order consistent with this Memorandum Opinion.

Dated this 23rd day of January, 2015.

KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE

27